UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ASHLEIGH DAVIS,

                Plaintiff,

-vs-                             Case No.  5:12-cv-609-Oc-10PRL

CITY OF LEESBURG, GARY S.
BORDERS, as SHERIFF OF LAKE
COUNTY FLORIDA, CHRISTOPHER
ALANIZ, KENNETH LANE, NICK
ROMANELLI, RYAN ABSTON, TRAVIS
DALRYMPLE, CHARLES GRECO,
MICHAEL GODIGKEIT, J.G.
SOMMERSDORF, THOMAS BROWN,
SHAWN LUKENS, and RICHARD
SYLVESTER

                Defendants.
_____

## <u>ORDER GRANTING SUMMARY JUDGMENT</u>

On April 9, 2011, Plaintiff Ashleigh Davis was arrested while attending the Leesburg

Bike Fest.  During the course of her arrest and subsequent detention at the Leesburg

Police Department and the Lake County Jail, Ms. Davis contends that she was subjected

to unconstitutionally excessive force, denied medical care, and was degraded and

humiliated by various City of Leesburg police officers and Lake County Sheriff's Deputies.

She has asserted 20 claims against the City of Leesburg, Lake County Sheriff Gary S.

Borders, and nine individual police officers and sheriff's deputies alleging violations of her

civil rights under 42 U.S.C. § 1983, as well as various state law torts (Doc. 25).

The case is presently before the Court on the Defendants' motions to dismiss the Second Amended Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) (Docs. 26-27), to which Ms. Davis has filed timely responses in opposition (Docs. 28, 35). The Defendants have also moved for summary judgment on all claims (Docs. 53, 55-58). Ms. Davis has filed a timely response (Doc. 67), and with leave of Court the Defendants have filed reply briefs (Docs. 73, 76).  The motions are therefore ripe for disposition.

Upon due consideration, and for the reasons discussed below, the Court finds that the motions to dismiss are due to be denied and the motions for summary judgment are due to be granted as to all claims.

### Undisputed Material Facts

On April 9, 2011, Plaintiff Ashleigh Davis and her best friend, Alicia Hurst Winchenbach decided to attend the Leesburg Bike Fest, an annual motorcycle festival held in downtown Leesburg, Florida.  Ms. Winchenbach drove, and picked up Ms. Davis at her house sometime between 2 p.m. and 3 p.m.  On the way to the Bike Fest, they stopped off at a liquor store and purchased a fifth of vodka.  They then stopped at a convenience store and purchased a 32 ounce plastic cup, which they filled with approximately 16 ounces of Sprite, and 16 ounces of the vodka.  Ms. Davis and Ms. Winchenbach shared this drink throughout the afternoon, each consuming approximately one-half of the contents.

Ms. Davis and Ms. Winchenbach arrived at the Bike Fest at approximately 3:30 p.m. (Deposition of Ashleigh Davis, p. 43, Doc. 54-14 ("Davis Dep.")).[1]  Ms. Davis was wearing a pink and black leopard print bikini bathing suit top, a hot pink tank top, a denim mini-skirt, fishnet stockings, and wedge sandals.  It was a very hot day, and at some point in the afternoon Ms. Davis removed the tank top, looping it through one of her skirt's belt loops.

Ms. Davis and Ms. Winchenbach met up with other friends at a bar, and around 5:00 p.m. Ms. Davis consumed a shot of alcohol called a "buttery nipple."  Sometime between 6:30 and 7:00 p.m., Ms. Davis and her friends went to another bar.   While at this bar, she consumed another shot called a "Jager bomb" which is comprised of a shot of Jagermeister liquor and a Red Bull energy drink.   Within an hour of consuming this second shot of alcohol, Ms. Davis and Ms. Winchenbach left the bar and walked over to the music stage area located near the front of City Hall.  Ms. Davis accidentally left Ms. Winchenbach's cell phone in the bar.

When Ms. Davis arrived at the stage area, she sat down on the ground.  She was tired and had not eaten anything since breakfast around 10-11 a.m. that morning.  Ms.

---

[1]Ms. Davis' deposition was taken on November 7, 2013 (Doc. 54-14).  The Defendants filed their motions for summary judgment on January 15, 2014 (Docs. 53, 55-58).  On February 7, 2014, Ms. Davis executed an Affidavit in support of her opposition to summary judgment (Doc. 67-5), which directly conflicts with several facts she testified to in her prior deposition.  Ms. Davis cannot create material issues of fact with an affidavit that merely contradicts, without explanation, clear and unambiguous deposition testimony.  Van T. Junkins and Assocs., Inc. v. U.S. Industries, Inc., 736 F.2d 656 (11th Cir. 1984); Lane v. Celotex Corp., 782 F.2d 1526, 1532 (11th Cir. 1986).  The Court will therefore ignore any statements in Ms. Davis' Affidavit that directly contradict her clear and unambiguous deposition testimony, especially in the absence of any credible explanation concerning the difference between the two accounts.

Davis is 5'6" inches tall and on April 9, 2011 she weighed between 135 and 140 pounds. Ms. Davis admits that on the evening of April 9, 2011 she was highly intoxicated, may have blacked out on several occasions, and does not remember many of the events that occurred that evening. (Davis Dep., pp. 54, 59, 95, 117, 128, 194).  What follows is a recitation of the facts as Ms. Davis remembers them, along with the undisputed testimony of the Defendant police officers and sheriff's deputies, all taken in the light most favorable to Ms. Davis.

**I.     Ms. Davis' Arrest**

Ms. Winchenbach and her ex-boyfriend began arguing near the music stage area. Ms. Davis stood up, pulled Ms. Winchenbach away from her ex-boyfriend, and told her that she was ready to leave.  However, they were both too intoxicated to drive, and could not call Ms. Winchenbach's fiancee to come pick them because Ms. Davis had lost Ms. Winchenbach's cell phone.  Ms. Davis contends that she was not fighting with Ms. Winchenbach, rather, they were talking about the missing cell phone using very loud voices.  However, Ms. Winchenbach testified that she and Ms. Davis were arguing about her lost cell phone (Deposition of Alicia Hurst Winchenbach, Doc. 67-4, pp. 34-35 ("Wichenbach Dep.")).

Police officers from the City of Leesburg and deputies from the Lake County Sheriff's Office were assigned to patrol the Bike Fest, and were jointly responsible for law enforcement activities at the event.  The officers and deputies were assigned to the event

in pairs – one police officer with one sheriff's deputy.  Defendant Sergeant Nick Romanelli was the supervising officer from the Leesburg Police Department, and Sergeant Phil Buffington was the supervising officer from the Lake County Sheriff's Office.   The downtown Leesburg area was blocked off to all motor vehicles except motorcycles; therefore law enforcement patrolled the area on foot or via golf cart.

Defendant Ryan Abston, a Leesburg police officer, and Defendant Shawn Lukens, a Lake County Sheriff's Deputy, were paired together to patrol the Bike Fest.   At approximately 10:20 p.m., a male patron approached the two officers and complained about two women causing a possible disturbance over by the music stage area.   The officers walked over to the stage area, and Officer Abston observed Ms. Davis and Ms. Winchenbach yelling and standing very close together, with one of them grabbing the face of the other.  A number of individuals were forming a circle around the two women.  Officer Abston tried to talk to Ms. Davis and Ms. Winchenbach, but they told him to go away. Bystanders informed Officer Abston that the two women were drunk and had been fighting with each other.  Officer Abston asked Ms. Davis and Ms. Winchebach to follow him away from the crowd to speak with him.  They both initially refused.  After multiple requests, Ms. Davis and Ms. Winchenbach finally agreed to walk over to a less crowded area with Officer Abston and Deputy Lukens.

They walked over to an area near Main Street and Sixth Street.  Officer Abston testified at his deposition that both Ms. Davis and Ms. Winchenbach were obviously intoxicated.  He told both women that they were drunk and causing a disturbance, and that

they needed to leave for the night but could return the next day.  Both women refused to leave and began arguing with Officer Abston.  Officer Abston checked their ID's and then again told them that they both had to leave and "were being trespassed."  The two women continued to argue and became belligerent, stating that they were too drunk to drive home, did not have a ride, could not call for a ride because Ms. Winchenbach's cell phone was missing, and that it was dark out and they were scared to be out by themselves.  (Davis Dep., p. 46). Officer Abston then offered to walk them over to an area where they could obtain a taxi, but again they refused.  Officer Abston and Deputy Lukens both testified that Ms. Davis and Ms. Winchenbach were argumentative, hostile, and belligerent, and were cursing at both law enforcement officers.

Ms. Davis does not remember any law enforcement officers arriving at the music stage area to talk to her or Ms. Winchenbach.  She does remember someone telling her that she and Ms. Winchenbach "were being trespassed," and that she told someone that she could not leave because she did not have a ride.  Ms. Davis does not remember how many times she was told to leave, whether any officer informed her that taxis were available, and does not remember how long she argued with the officers.  She also does not remember if the officers were wearing uniforms or had badges.  (Davis Dep., pp. 59, 61-64).  Ms. Davis does remember, however, that at some point, after repeatedly refusing to vacate the premises, Ms. Winchenbach threw a drink at Officer Abston.  (Id., p. 65). Officer Abston then attempted to arrest Ms. Winchenbach, at which time Ms. Davis tried to grab her friend to get her away from Officer Abston.  (Id., p. 66).  Officer Abston and

6

Deputy Lukens both testified that Ms. Davis tried to punch Officer Abston, and then tried to pull Ms. Winchenbach away.[2]

At this point, Deputy Lukens intervened.  He blocked Ms. Davis from hitting Officer Abston and also attempted to arrest her.  Ms. Davis became extremely combative and began fighting with Deputy Lukens.  She remembers kicking Deputy Lukens, resisting his efforts to handcuff her, and screaming and cursing.  (Davis Dep., pp. 66, 68, 71, 74).  Deputy Lukens testified that Ms. Davis also spat at him and attempted to bite him.  Deputy Lukens eventually got Ms. Davis onto the ground, but she continued to struggle.

By this time, several other law enforcement officers had arrived at the scene.  Defendants Leesburg Police Officer Christopher Alaniz and Sheriff's Deputy Richard Sylvester were partnered together that night and responded to Officer Abston's call about a disturbance involving two women located at Sixth and Main.  They walked over to the area, and Officer Alaniz overheard the other officers telling Ms. Davis and Ms. Winchenbach that they were being trespassed and needed to leave.  Officer Alaniz also witnessed Ms. Davis attempt to hit Officer Abston and her struggle with Deputy Lukens.  Officer Alaniz assisted Deputy Lukens in handcuffing Ms. Davis with her hands behind her back while she was on the ground.  Ms. Davis continued to resist even after she was handcuffed; she continued to kick and spit at the officers, and kicked Officer Alaniz several times.

---

[2]Ms. Davis cannot remember whether or not she touched or hit Officer Abston (Davis. Dep., pp. 66, 68).

While Officer Alaniz and Deputy Lukens struggled with Ms. Davis, Officer Abston managed to secure Ms. Winchenbach with handcuffs.  He then attempted to maintain control of her with one arm, while also maintaining security of the crowd that was rapidly forming in the area.  Other officers and sheriffs deputies continued to arrive on scene, both on foot and in golf carts, including Defendants Officer Kenneth Lane, Deputy Sheriff Thomas Brown, and Sergeants Romanelli and Buffington.  Ms. Davis spit on Sergeant Buffington when he arrived.

Due to concerns about the growing crowd, as well as Ms. Davis' and Ms. Winchenbach's combative behavior, Sergeants Romanelli and Buffington made the decision that both women needed to be removed from the area as quickly as possible. Rather than waiting for patrol cars, they determined that the two women should be transported to the Leesburg Police Station booking room via golf carts.  Several officers then walked Ms. Davis and Ms. Winchenbach a short distance away to a less crowded area near Sixth Street and Magnolia where two golf carts were waiting.  The officers repeatedly told Ms. Davis to calm down and to stop resisting, but she admittedly refused to do so.  (Davis Dep., p. 76).  Ms. Davis continued to kick, scream, bite, spit, and curse at the officers, and spit on Deputy Lukens.  At some point during her continued struggles, Ms. Davis' bikini top became undone at her waist.  Although it was still tied around her neck, her breasts were exposed.[3]

---

[3]Deputy Lukens and Officer Alaniz both testified that they attempted to retie the back of Ms.
(continued...)

Ms. Davis continued to violently resist and struggle, including continuing to try and kick and spit on officers, and the decision was made to place Ms. Davis in four point restraints. A four point restraint involves placing a violently resisting suspect's legs in cuffs, and then attaching the leg restraints to the suspect's handcuffs behind the suspect's back so that the suspect is immobilized. At the time of Ms. Davis' arrest, the officers did not have any leg irons or a "hobble device" (a nylon strap with a loop on one end and a clip on the other used to attach leg irons to handcuffs), so instead, Deputy Sylvester used another pair of handcuffs to restrain Ms. Davis' legs, and his K-9 nylon dog leash to secure the leg cuffs and handcuffs together.[4]

Four officers, including Officer Alaniz and Deputy Lukens, then carried Ms. Davis to one of the golf carts and placed her on the back seat. Two officers carried her arms up by her shoulders and two carried her legs. She was placed face down on her stomach, so that her breasts were no longer exposed, however her head was slightly tilted and resting between the seat cushions so as not to impede her breathing. (Davis Dep., p. 84). Ms. Davis has not alleged that she was unable to breath, or that she suffered any injuries while

---

[3](...continued)

Davis' bikini top, but that she continued to struggle and refused to allow them to help her. Sergeant Buffington also testified that he attempted to cover Ms. Davis with a shirt at the scene of her arrest, but she kept throwing the shirt off her. Ms. Davis, however, testified that no officer ever tried to cover her up at any point in time.

[4]Ms. Davis testified that once her legs were restrained she stopped kicking or resisting, but continued to scream and curse at the officers. (Davis Dep., pp. 74, 77, 81).

riding in the golf cart, other than she was uncomfortable.  Officer Alaniz and Deputy Lukens stood on the sides of the golf cart by the back seat to monitor Ms. Davis.[5]

The officers transported Ms. Davis to the Leesburg Police Station's booking room, which was located approximately six blocks from the scene of Ms. Davis' arrest – a few minutes drive even by golf cart.   Officer Abston, Officer Lane and Deputy Brown transported Ms. Winchenbach (who was not in four point restraints) to the booking room in a separate golf cart.  Up to this point, neither Deputy Brown nor Officer Lane had any contact with Ms. Davis, their involvement was limited to the transport of Ms. Winchenbach.

Ms. Davis admits that other than the restraints being uncomfortable and stretching her, she was not subjected to any other force at the time of her arrest or transport to the booking room.  No officer or deputy hit or kicked her, used pepper spray, deployed a taser, or used any other weapon against her.  (Davis Dep., pp. 78, 81).

## II.    Ms. Davis' Arrival at the Booking Room

By the time Ms. Davis arrived at the booking room, her bikini top had come completely off.[6]  Several officers carried Ms. Davis into the Leesburg Police Department's booking room, and placed her on the floor on her stomach, again covering her bare breasts.  As Ms. Davis was carried into the booking room, and throughout her time in the

---

[5]The record does not clearly identify the officer who drove the golf cart carrying Ms. Davis.

[6]Some witnesses have testified that the bikini top was still tied around Ms. Davis' neck, but Ms. Davis contends that she was completely topless.  In any event, there is no dispute that Ms. Davis' breasts were exposed while she was in the booking room.

booking room, she continued to yell, curse, move her arms and roll around, but does not remember if she spit on anyone. (Davis Dep., pp. 87-88). The officers repeatedly told Ms. Davis to be quiet and calm down, but again she refused to do so. (Id., p. 88). Once Ms. Davis was placed on the floor, the four point restraints were removed, although Ms. Davis' hands and legs remained restrained. It appears that Ms. Davis remained seated on the floor, near a long bench – there is nothing in the record suggesting that any officers attempted to lift her onto the bench.

Other officers walked Ms. Winchenbach into the booking room and sat her on the bench. Officer Lane removed her handcuffs and shackled her legs to a metal bar located under the bench. Once they arrived at the booking room, Officer Abston began processing Ms. Davis' and Ms. Winchenbach's arrest paperwork. He had no further direct contact with Ms. Davis. Deputy Lukens left the booking room after a very short period of time and also had no further contact with Ms. Davis while she was in the booking room.

Several officers testified that they attempted to cover up Ms. Davis while she was seated on the floor of the booking room, and at one point Sergeant Buffington tried to give Ms. Davis her tank top, but Ms. Davis continued to refuse any assistance. Ms. Davis, however, testified that no officer ever tried to cover her bare chest. Officer Lane allowed Ms. Winchenbach to attempt to help retie Ms. Davis' bikini top and/or to cover her up with another article of clothing. However, Ms. Davis refused to allow Ms. Winchenbach to assist her, testifying that "at that point I was angry. I didn't know what was going on. I didn't want no one touching me, and I was hurt." (Davis Dep., pp. 90-91, 209-10). Ms. Davis' breasts

remained exposed throughout her stay in the booking room; however, she does not recall any officers looking directly at her breasts. (Id., pp. 140-41).[7] Ms. Davis also testified that some of the officers, who she cannot identify, were laughing and joking, but she cannot remember what was said. (Id., pp. 128-29).

During one of the attempts to cover Ms. Davis' chest, she and Ms. Winchenbach began to argue and try to fight with each other. Several officers pulled Ms. Winchenbach away from Ms. Davis and sat Ms. Winchenbach back on the bench. While she was on the bench, Ms. Winchenbach became aggressive and agitated, and Officer Lane walked over to her to try and calm her down and keep her seated. Ms. Winchenbach punched Officer Lane in the nose, bloodying it. Several officers then restrained Ms. Winchenbach on the floor and ultimately placed her in four point restraints. Deputy Sylvester, who by that time had walked over to the booking room from the scene of Ms. Davis' arrest, stood in front of Ms. Davis, who was still sitting on the floor with her arms and legs restrained, in an effort to keep her calm and prevent her from interfering with the restraint of Ms. Winchenbach. He was not touching Ms. Davis, but was merely attempting to block her view of what was happening with Ms. Winchenbach.

---

[7] In her later filed affidavit, Ms. Davis testified that the officers were all gawking at her and her bare breasts the entire time she was in the booking room, and that she could hear officers making crude remarks about her (Doc. 67-5, ¶¶ 8-9). Ms. Davis does not specify what the comments were, and cannot remember the identity of any officers who were making such remarks.

Deputy Sylvester briefly turned away from Ms. Davis, at which time she leaned over and tried to bite him on the back of his left calf.  (Davis Dep., pp. 95-96).  Ms. Davis did not make contact with his leg, although she admits she tried to bite Deputy Sylvester because she was aggravated with the officers, who kept telling her to be quiet and to stop yelling and cursing, and because they would not remove her handcuffs.  (Id., pp. 92-95).  Ms. Davis testified that after she tried to bite Deputy Sylvester, an officer grabbed her by the back of her hair and smashed her face into the floor, breaking three of her front teeth. (Davis Dep., pp. 92, 96-97, 104-05).  Ms. Davis further testified that this officer then told her "try to bite again. . . now you'll look like the rest of them in Leesburg."  (Id., p. 92).[8]  Ms. Davis claims that she was bleeding from her gums, teeth, and nose, and that blood was visible on her face.  She also started screaming "you busted my teeth out."  (Davis. Dep., pp. 105-106).  Although Ms. Davis did not specifically request medical attention, she repeatedly screamed "you busted my teeth out," and "my teeth hurt my mouth hurts."  (Id., pp. 106-07, 109, 147).

Although Ms. Davis could not identify the officer who broke her teeth, Deputy Sylvester testified that after Ms. Davis tried to bite him on the leg, he placed his hand on

---

[8]Ms. Davis' testimony is confusing on this point given her somewhat poor memory of that night.  She is consistent in her testimony that after she attempted to bite Deputy Sylvester, an officer grabbed her by the back of her hair and smashed her face into the ground, breaking her teeth.  She is also consistent with respect to the comments the officer made to her after smashing her face into the ground.  Ms. Davis is confused, however, as to the identity of the officer who grabbed her hair, as well as when this event occurred, stating at various points in her deposition that it took place out on the sidewalk during her arrest, and both before and after she was placed in four point restraints for the second time.

the back her neck and used sufficient force to put her head to the ground, where he kept Ms. Davis for just under two minutes until she stopped resisting.  During this time, Ms. Davis was resisting by wiggling and moving around. (Davis Dep., p. 102).  Deputy Sylvester further testified that he did hear Ms. Davis complain about her broken teeth, and observed  that one of her teeth was broken, but did not see any blood.  No officer provided Ms. Davis with any medical care while she was at the booking room.

At some point, Ms. Davis also bit Officer Alaniz on the hand, drawing blood.[9]  Ms. Davis testified that she bit him because he put his hand over her mouth to stop her from screaming and cursing.  (Davis Dep., pp. 98-99).  Officer Alaniz testified that he never placed his hand over her mouth, but was bitten when he helped to restrain Ms. Davis after she tried to bite Deputy Sylvester.[10]

Due to Ms. Davis' continued struggling and her attempts to bite various officers, Ms. Davis was placed back into the four point restraints.  Sergeant Buffington made the decision that Ms. Davis and Ms. Winchenbach were too violent and non-compliant to remain in the booking room, and that both women should be transported to the Lake County Jail for booking and detention, rather than completing the booking process at the

---

[9]Ms. Davis testified that she did not think she drew blood because she did not taste any blood in her mouth.  (Davis Dep., pp. 100, 152).

[10]Once Officer Alaniz realized he had been bitten, he left the booking room to get medical care for the bite on his hand.  He did not have any further contact with Ms. Davis.

police station.[11]  Ms. Davis has admitted to her violent behavior, as well as to continuing to resist, and scream, and that the law enforcement officers repeatedly told her to calm down and cooperate.  When asked at her deposition why she refused to comply, Ms. Davis testified "you can't reason with drunk people."  (Davis Dep., pp. 94-95).

Shortly after Ms. Davis was placed in the four point restraints, she was transported to the Lake County Jail.  Deputy Lukens (who up until this point had been standing outside the booking room and did not participate in the four point restraints of Ms. Davis), Officer Lane, and one other officer picked Ms. Davis up and placed her on her stomach in the back of Sergeant Buffington's  patrol vehicle.  Ms. Davis was still topless, however her breasts were not exposed when she was on the back seat of the patrol car.  Deputy Lukens drove Ms. Davis to the Jail.[12]

## III.   Video of the Booking Room

As part of its investigation into Ms. Davis' arrest and detention, the City preserved the portion of the video recording from the police station's booking room relating to her arrest.  (Doc. 61).  The video, which does not have any audio recording, starts after Ms.

---

[11]The Leeseburg Police Department does not have a jail or holding facility.  Normally when suspects are arrested they are transported directly to the Lake County Jail.  The police station's booking room is used solely to process some arrests prior to detention at the Jail.  Ms. Davis and Ms. Winchenbach were brought to the booking room first because the officers did not have immediate access to patrol cars at the Bike Fest, could not wait for patrol cars to arrive due to the two women's continued aggression and the rapidly growing crowd, and they were transporting the women in golf carts at the time.  The police station is only six blocks from the scene of Ms. Davis' arrest, whereas the Lake County Jail is located several miles away.

[12]Ms. Davis alleged in her Second Amended Complaint that she was transported to the Jail with a bag over her head.  The record evidence does not support this allegation.

Davis was carried into the booking room, and placed on the floor.  Ms. Winchenbach was already sitting on the bench with her legs shackled.  The video shows two officers removing Ms. Davis' four point restraints and then moving away from her while she is still laying on her stomach.  Ms. Davis then sits up, with her hands and legs still restrained, and Ms. Winchenbach goes over to her and attempts to help cover Ms. Davis' bare chest.  After several seconds, one of the officers separates Ms. Winchenbach from Ms. Davis.  A few seconds later, the officers permit Ms. Winchenbach to again go over to Ms. Davis in an attempt to cover her up.  This attempt also only lasts for a few seconds, when Ms. Winchenbach appears to fall on top of Ms. Davis, and two officers again separate the women.  At this point, Ms. Davis is seated on the floor facing a wall, and Ms. Winchenbach is sitting on the bench.  At no point does the video depict any officer attempting to cover Ms. Davis' bare breasts.

The video then shows Ms. Winchenbach becoming agitated and initiating an altercation with Officer Lane, during which time she punches him in the face.  Several other officers come into the room, and Deputy Sylvester can be seen standing next to Ms. Davis, but not touching her.  Deputy Sylvester then turns his head in the direction of Ms. Winchenbach.  Although Ms. Davis's face and upper torso are blocked from camera view, it appears that she makes some sudden motion, and Deputy Sylvester quickly turns around, grabs Ms. Davis by the back of the neck and forces her head to the ground.  Shortly after Deputy Sylvester forces Ms. Davis' head to the ground, Officer Alaniz can be

seen walking over and kneeling next to Ms. Davis.  Twelve seconds later he gets up and walks away, and has no further contact with Ms. Davis.

While Ms. Davis is being held on the ground, several other officers work to subdue Ms. Winchenbach, who is now also on the floor.  Deputy Sylvester continues to hold Ms. Davis by the back of the neck and keeps her head on the ground for approximately one minute and 46 seconds, at the conclusion of which he stands up and walks away.  Deputy Sylvester does not touch Ms. Davis again.  The video does not show any blood on Ms. Davis' face, nor is there any blood on the floor of the booking room.

About 90 seconds after Deputy Sylvester walks away, three other law enforcement officers place Ms. Winchenbach – who has continued to resist and attempt to attack the officers – in four point restraints.  Once Ms. Winchenbach is restrained, three officers then place Ms. Davis in four point restraints.  No other force is used on Ms. Davis.  Less than two minutes after the women are restrained, the officers carry Ms. Winchebach out to a patrol car for transport to the Lake County Jail.  Two minutes after that, three officers carry Ms. Davis out to a patrol car, one officer at each shoulder, and one officer carrying her legs.  In total, Ms. Davis remained in the booking room for approximately 11 minutes.

## IV.    Post Arrest Events

Ms. Davis was formally booked into the Lake County Jail at 11:17 p.m., less than one hour after the initial complaint came in about Ms. Davis causing a disturbance at Bike Fest. Upon her arrival, members of the Lake County Sheriff's Office detention staff carried Ms.

Davis inside.  The four point restraints were then removed.  Ms. Davis remained extremely angry, continued to curse, was uncooperative, and resistant.  As a result, Jail staff placed her in a holding cell by herself for approximately an hour to an hour and a half until she calmed down.  (Davis Dep., pp. 111, 114).  During this time, Ms. Davis refused to allow anyone in the jail to cover her up, assist her in getting dressed, or to give her clothing.  (Id., pp. 111-114).  At one point, Jail personnel asked Ms. Winchenbach to speak to Ms. Davis in an attempt to calm her down.  Ms. Winchenbach stood outside Ms. Davis' cell and testified that she saw Ms. Davis sitting on a bed naked, crying about her broken teeth. Other than the broken teeth, Ms. Winchenbach did not see any blood on Ms. Davis' face or any other injuries.  (Winchenbach Dep., pp. 62).[13]

Once Ms. Davis calmed down, was given clothing, and her paperwork was processed, she complained to a nurse at the Jail about her broken teeth, various bruises, a bump on her head, and pain in her chest, neck, back, ankles, and knees.  (Davis Dep., p. 207).  She also requested and received pain medication for a headache.  (Davis Dep., p. 107).  The record does not reveal whether Ms. Davis received any further medical treatment while at the Jail.

Ms. Davis was released from the Jail on April 10, 2011.  On April 11, 2011, she filed a complaint with the Leesburg Police Department.  She did not file a complaint with the

---

[13]Ms. Winchenbach's later created affidavit directly conflicts with her deposition testimony on the issue of whether any blood was on Ms. Davis' face, and will not be given any further consideration.  (Doc. 67-3).

Lake County Sheriff's Office.  Ms. Davis' complaint related solely to her broken teeth – she did not allege that she was topless, that her restraints were inappropriate or excessive, or that any officers made any lewd comments, jokes, or gawked at her.  (Doc. 54-10, p. 2). Her complaint states that after she tried to bite two different officers, "some officer grab my head and slammed my teeth into the pavement leaving me w/3 broken teeth after I was completely restrained and unable to hurt anyone.  Then after said now you will fit in just right then after I was screaming about him busting my teeth out. [sic]"  (Id.).

Corporal Allen Carter met with Ms. Davis on April 11, 2011, conducted a brief interview, took photos of Ms. Davis' injuries, and received her written complaint.  (Doc. 54-10, p. 1).  Corporal Carter also prepared an inter-office memo that recounted the interview. It states, in relevant part:

> Ms. Davis stated that on April 9, 2011, at approximately 2200-2300 hours she and a female friend were attending the Leesburg Bikefest when she became involved in a physical confrontation that required police intervention.  Ms. Davis stated that during the altercation, prior to which she had been consuming alcohol, she resisted the police and was subsequently arrested and "hog tied."  She stated that at one point an officer covered her mouth and she bit his hand.  Ms. Davis stated that a short time later, prior to transport to the police department, she was grabbed by the back of her head/hair and her face was slammed into the sidewalk while her mouth was open, reportedly resulting in damage to three of her front teeth.  Ms. Davis stated that she believes this action was a response to her attempt to bite an officer on the lower portion of his leg.  Ms. Davis could not provide much specific detail and does not know which officer committed the alleged offense.
>
> Ms. Davis' concerns were the officer's response to her actions (she said multiple times that she should have been tased for getting out of line but not dealt with by any other means), the resultant injury, and a claim that she was verbally ridiculed by the officers during transport to LPD for booking.  Ms.

Davis stated that she has not received any medical or dental treatment for her injuries. . . .

(Doc. 54-10, p. 1).

The City investigated the complaint, and determined that it was unfounded.  The City then forwarded the complaint to the Lake County Sheriff's Office.  It does not appear that the Sheriff's Office ever conducted any investigation.

On April 29, 2011, Ms. Davis was formally charged by Information with four third-degree felonies:  three counts of battery on a law enforcement officer in violation of Fla. Stat. §§ 784.03(1)(a) and 784(2), and one count of resisting a law enforcement officer with violence in violation of Fla. Stat. § 843.01.  She was also charged with one second-degree misdemeanor:  disorderly intoxication in public in violation of Fla. Stat. § 856.011 (Doc.12-1, pp. 1-2).  (Davis Dep., p. 126).  Ms. Davis faced a maximum sentence of 20 years and 60 days imprisonment, and $20,500 in fines (Doc. 12-1, p. 3).  On August 25, 2011, Ms. Davis entered into a plea agreement whereby adjudication of guilt was withheld on all five charges in exchange for a plea of nolo contendre to the charges (Doc. 12, p. 3) (Davis Dep., pp. 127, 171).  On September 16, 2011, final judgment was entered, and Ms. Davis was sentenced to three years probation, 26 weeks of counseling, and assessed various fees (Doc. 12-1, pp. 8-11) (Davis Dep., p. 127).[14]

---

[14]Ms. Winchenbach was charged with the same offenses, which were disposed of in the same manner.

Ms. Davis testified at her deposition that she "would apologize for acting the way I did, getting out of hand.   There was no reason for that. I should have been more responsible with my alcohol."  (Davis Dep., p. 128).   She also admitted that all of her actions on the night of April 9, 2011 were inappropriate, with the exception of biting Officer Alaniz, because he allegedly had his hand over her mouth.   (Id., pp. 132-33).  Ms. Davis also testified that she believed the officers were entitled to use a higher degree of force on her that night; when asked if the officers should have tased her, Ms. Davis responded:  "If I was that out of control like they thought I was, probably."  (Id., p. 129).

## V.    Ms. Davis' Injuries

Ms. Davis alleges that she suffered the following injuries: three broken teeth, bruises on her arms, legs, back, head, and neck, and a headache.  She testified that she sought dental care for her teeth a few days after her arrest, but otherwise never sought any immediate medical attention for any of her injuries.  (Davis Dep., p. 123).  Ms. Davis testified that she has neck and shoulder pain, but admits that this pain did not manifest itself until April 2012, approximately one year after her arrest (Id., pp. 39, 122).

Ms. Davis also testified that she suffers from emotional distress, primarily due to her criminal charges, the expense of hiring a defense attorney, her lengthy probation term, and her fear that she will not be able to complete nursing school and/or find employment due to her criminal record.  She also claims embarrassment from being topless in front of so many people (Id., pp. 153-54, 236-37).  Ms. Davis saw a mental health counselor for one

session in April 2013 (Id., p. 157).  With respect to other compensatory damages, Ms. Davis claims she missed one day of work in 2012 due to her neck and shoulder pain (Id., p. 154).

## VI.    Leesburg Police Department and Lake County Sheriff's Office Policies

In 2011, both the Leesburg Police Department and the Lake County Sheriff's Office had formal policies in place which governed the use of force and restraints, including four point restraints, and the provision of medical care to arrestees.

The Leesburg Police Department's General Order 16-2 governs the use of force, and states that "Officers will use only the force that is reasonably necessary to affect lawful objectives."  Further, "Officers will use only the degree of force that is necessary to resolve a situation.  Justification for the use of force is limited to what the officer knows or perceives at the time."  (Doc. 54-6, pp. 1, 3).  With respect to restraining tools, General Order 16-2 provides that "Subjects shall be restrained in a manner so as not to injure themselves or others."  (Id., p. 9).  The General Order also contains a section on four point restraints:

D.    Four-Point Restraint:    Members may utilize a four-point restraint to control aggressive resistance that creates an imminent danger to anyone or when other restraint tools have been ineffective.

1.    A four-point restraint involves securing the subject's feet to his/her hands from the rear, using handcuffs, flex-cuffs, and/or a ripp-hobble.

2.    Members shall not "cinch down" the handcuffs, flex-cuffs, or hobble.

3. The feet should not be brought past a 90-degree angle to the body. This will provide the safest method of utilizing the technique.

4. To prevent "positional asphyxia," members will roll the subject onto his/her side. Members shall monitor any subject in a four-point restraint at all times.

   a. If an emergency exists, the member may transport a four-point restrained subject out of the immediate area. When possible, two members should transport. The passenger member should observe the subject, monitoring his/her color, breathing, and level of consciousness. During hours of darkness, an internal light source (e.g., flashlight or dome light) should be used to provide a clear view of the subject when natural light sources are not sufficient. The subject will be monitored and repositioned as soon as it can be done safely.

   b. If there is any doubt as to the subject's condition, members should immediately call paramedics to the scene. Members shall continue to closely monitor and assist the subject where possible until paramedics arrive. The subject should be transported to the hospital by ambulance when needed. Whenever a four-point restrained subject is transported by ambulance, a member should ride in the ambulance.

(Doc. 54-6, pp. 9-10).

Lake County Sheriff's Office's procedures on the use of force are contained in General Orders 4 and 29. General Order 4 provides that "Deputies are permitted to use force that is reasonable and necessary in order to protect themselves or others from bodily harm; however, they may use only that degree of force necessary to effect lawful objectives and such use of force shall conform to the provisions of Florida Statutes." (Doc. 55-5, p. 1). General Order 29 states that "Deputies will restrain all persons arrested or taken into

23

custody using authorized restraining devices.  Such restraint devices include handcuffs that are double-locking, double-locking leg irons, and plastic flex cuffs."  (Doc. 55-5, p. 19). "The use of handcuffs and leg irons in a four-point restraint is authorized for violent or combative detainees in order to keep them from injuring themselves, or others."  (Id., p. 20).  In addition, the Sheriff's Office has a policy that requires a detainee to be evaluated by medical personnel if the detainee is injured during an arrest.  (Affidavit of Lieutenant John Harrell, ¶ 7, Doc. 55-5).

Ms. Davis has not submitted any evidence of prior incidents involving either the Lake County Sheriffs Office or the Leesburg Police Department relating to the use of four point restraints, dealing with nude or partially nude arrestees, or denying medical care.[15]

### Procedural History and The Second Amended Complaint

Ms. Davis initially filed a 14-count complaint against the Defendants in state court on October 9, 2012 (Doc. 2), and the Defendants removed the case to this Court on October 29, 2012 (Doc. 1).  Ms. Davis then filed a 43-count Amended Complaint against these same Defendants (Doc. 11).  On September 16, 2013, the Court granted the Defendants' motions to dismiss, and provided Ms. Davis with an opportunity to file another amended pleading (Doc. 24).

---

[15]Ms. Davis has filed a report from Charles Drago, a purported expert in law enforcement, use of force, and restraint techniques (Docs. 30, 51, 64).  However, his report is unsworn and he has not been deposed.  As such, the report is hearsay and will not be considered in deciding the present motions.

Ms. Davis filed her Second Amended Complaint on October 14, 2013, asserting 20 claims against the Defendants (Doc. 25).  The Second Amended Complaint consists of 32 pages, 184 numbered paragraphs, and 20 numbered counts (Doc. 25).  Ms. Davis' claims are for municipal liability against the City of Leesburg and the Sheriff of Lake County, Florida in his official capacity; and individual capacity liability against four Leesburg Police Officers (Christopher Alaniz, Kenneth Lane, Nick Romanelli, and Ryan Abston); and three Lake County Sheriff's Deputies (Thomas Brown, Shawn Lukens, and Richard Sylvester).[16]

Fifteen of Ms. Davis' claims are brought under 42 U.S.C. § 1983, and are based on the following theories of relief: (1) excessive force against the City of Leesburg, Sheriff Borders, Lukens, Alaniz, Lane, Romanelli, Abston, Brown, and Sylvester relating to her initial four point restraints and transport to the police station (Counts I-III); (2) excessive force against the City of Leesburg, Sheriff Borders, Alaniz, and Sylvester relating to the forcing of her face on the floor of the booking room, resulting in three broken teeth (Counts IV-VI); (3) excessive force against the City of Leesburg, Sheriff Borders, Lukens, Alaniz, Lane, Romanelli, Abston, and Sylvester relating to her second four point restraints and transport to the Lake County Jail (Counts VII-IX); (4) intrusion of bodily privacy against the City of Leesburg, Sheriff Borders, Lukens, Alaniz, Lane, Romanelli, Abston, Brown, and Sylvester relating to the loss of her bikini top and prolonged unclothed state (Counts X-XII);

---

[16]On November 12, 2013, Ms. Davis voluntarily dismissed without prejudice all claims against Defendants Michael Godigkeit and J.G. Sommersdorf (Doc. 39).  At the time the notice was filed, these Defendants had not filed an answer or motion for summary judgment. See Fed. R. Civ. P. 41(a)(1).

and (5) denial of access to medical care against the City of Leesburg, Sheriff Borders, Lukens, Alaniz, Lane, Romanelli, Abston, Brown, and Sylvester (Counts XIII-XV).

Ms. Davis has also asserted three state law battery claims: (1) against Lukens, Sylvester, Alaniz, and Romanelli relating to her initial four point restraints (Count XVI); (2) against Sylvester and Alaniz relating to the breaking of her teeth at the police station (Count XVII); and (3) against Sylvester and Lukens relating to the second four point restraints (Count XVIII). Lastly, Ms. Davis asserts a state law claim for intentional infliction of emotional distress against Lukens, Abston, Romanelli, Sylvester, and Alaniz (Count XIX), and a claim against the City of Leesburg for negligent spoilation of evidence relating to the preservation of the booking room video recording (Count XX).

### The Motions to Dismiss

In passing on a motion to dismiss under Rule 12(b)(6), the Court is mindful that "[d]ismissal of a claim on the basis of barebones pleadings is a precarious disposition with a high mortality rate." Int'l Erectors, Inc. v. Wilhoit Steel Erectors Rental Serv., 400 F.2d 465, 471 (5th Cir. 1968). For the purposes of a motion to dismiss, the Court must view the allegations of the complaint in the light most favorable to plaintiff, consider the allegations of the complaint as true, and accept all reasonable inferences that might be drawn from such allegations. Speaker v. U.S. Dep't of Health & Human Servs., 623 F.3d 1371, 1379 (11th Cir. 2010); Jackson v. Okaloosa County, Fla., 21 F.3d 1532, 1534 (11th Cir.1994). Once a claim has been stated adequately, it may be supported by showing any set of facts

26

consistent with the allegations of the complaint.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

In order to avoid dismissal, a complaint must allege "enough facts to state a claim to relief that is plausible on its face" and that rises "above the speculative level." Speaker, 623 F.3d at 1380 (citing Twombly, 550 U.S. at 570, 127 S. Ct. at 1964–65, 1974).  A claim is facially plausible "'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)).  The plausibility standard requires that a plaintiff allege sufficient facts to nudge his "claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570, 127 S. Ct. at 1974.  Moreover, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." Id., 555 U.S. at 555, 127 S. Ct. at 1964-65.

Ms. Davis' Second Amended Complaint satisfies these standards.  Her pleading sets forth all of the salient facts necessary to support each of her 20 claims.  She has alleged the identity of the Defendants who have purportedly violated her civil rights, and alleged sufficient facts specifying the manner in which each of these Defendants violated her rights. Ms. Davis has also alleged facts supporting her state law tort claims, and has identified the parties who allegedly engaged in such wrongdoing.  In other words, contrary to the Defendants' arguments in their motions to dismiss (Docs. 26-27), the Court finds that Ms.

Davis' Second Amended Complaint has corrected the deficiencies discussed in the Court's Order of September 16, 2013 (Doc. 24), and has complied with the dictates of Fed. R. Civ. P. 8(a) and 10(b).  Taking the facts alleged in the light most favorable to Ms. Davis, each of the claims can be reasonably inferred to adequately state claims for relief, and to put the Defendants on notice of the theories of liability asserted against each of them.

The Defendants also seek dismissal of the Second Amended Complaint based on the defenses of qualified immunity with respect to the § 1983 claims, and statutory immunity pursuant to Fla. Stat. § 768.28(9) with respect to the state law claims.  These arguments, which require a detailed, fact based analysis, are subsumed in the Defendants' respective motions for summary judgment, and will be addressed in that section of this Order.[17]

Accordingly, the Defendants' motions to dismiss (Docs. 26-27) will be Denied.

## The Summary Judgment Motions

**I.**      **Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and

---

[17]The Court notes that the City of Leesburg and Defendants Alaniz, Lane, Romanelli, and Abston briefly mention Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364 (1994), in their motion to dismiss (Doc. 26).  However, these Defendants do not make any substantive argument relating to Heck, and Ms. Davis makes clear in her Second Amended Complaint that she is not challenging her arrest, conviction, or sentence (Doc. 25, ¶¶ 50, 57, 64, 70, 77, 84, 91, 98, 105, 112, 119, 126, 132, 140, 148).  The Defendants also have not reasserted any argument under Heck in their summary judgment motions.  Therefore, the Court will not further consider the application of Heck to this case.  See also Dyer v. Lee, 488 F.3d 876, 879 (11th Cir. 2007).

the movant is entitled to judgment as a matter of law."  In applying this standard, the Court must examine the materials on file and the record evidence "in the light most favorable to the nonmoving party."  Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  When faced with a "properly supported motion for summary judgment [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

At the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).  Some degree of factual dispute is expected, but to successfully counter a motion for summary judgment the factual dispute must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248, 106 S. Ct. at 2510.

## II.    The Section 1983 Individual Capacity Claims

Ms. Davis has alleged claims of excessive force, intrusion of bodily privacy, and denial of medical care against the seven Defendant police officers and sheriff's deputies

in their individual capacities (the "Individual Defendants").   Each of these Individual Defendants asserts the defense of qualified immunity.

## A.    Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions from liability if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Snider v. Jefferson State Cmty. Coll., 344 F.3d 1325, 1327 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508 (2002)).  Qualified immunity is an immunity from suit rather than a mere defense to liability, and it is effectively lost if a case is erroneously permitted to go to trial.  Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985).

To receive qualified immunity, a government official must first prove that he was acting within his discretionary authority.  Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003).  Once the defendant establishes this, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.  Id.  The Supreme Court has established a two-part test to determine whether qualified immunity should apply.  The court must determine whether the plaintiff's allegations, if true, establish a constitutional violation.  Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 2514 (2002).  This requires the court to determine whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right.  Gonzalez, 325 F.3d at 1234.  The second prong of the test requires the court to determine whether the right was

"clearly established" at the time of the violation.  Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1291 (11th Cir. 2009) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)).  Following the Supreme Court's clarification in Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808 (2009), these two determinations may be made in either order at the discretion of the court.  Lewis, 561 F.3d at 1291.

There is no dispute that each of the Individual Defendants was at all times acting in within his discretionary authority.  Thus, the burden now shifts to Ms. Davis to show that her constitutional rights were violated, and if so, that such rights were clearly established as of April 9, 2011.  The Court finds that Ms. Davis has failed to meet this burden.

## B.   Excessive Force Claims Involving Restraints

Counts I and VII of the Second Amended Complaint allege that Deputy Lukens, Officer Alaniz, Officer Lane, Sergeant Romanelli, Officer Abston, Deputy Brown, and Deputy Sylvester used unreasonable and unconstitutionally excessive force against Ms. Davis when they placed her in four point restraints at the time of her arrest and again in the booking room, when they carried her to the golf cart (during arrest) and patrol car (to the Jail), and when she was transported in both vehicles while laying on her stomach.[18]  These claims can further be broken down into two categories: (1) the claims against Deputy Lukens, Officers Alaniz and Lane, and Deputy Sylvester – the officers who actually placed

---

[18]Deputy Brown is only alleged to have engaged in excessive force with respect to Ms. Davis' initial arrest.  He is not alleged, and there is no record evidence suggesting, that he was involved in any incidents that took place at the booking room, or in Ms. Davis' transport to Jail.

Ms. Davis in the four point restraints and/or participated in her transportation; and (2) the claims against Sergeant Romanelli, Officer Abston, and Deputy Brown, who witnessed the use of restraints and the manner in which she was transported, but did not intervene.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002). See also Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989) ( "[C]laims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard."). "In determining whether the officers' force was reasonable, [a court] must determine 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.' " Mercado v. City of Orlando, 407 F.3d 1152, 1157 (11th Cir. 2005). The court's inquiry focuses on whether the officer's actions were "objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (internal citations omitted).

To assess the reasonableness of the force used, "we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Scott v. Harris, 550 U.S. 372, 383, 127 S. Ct. 1769, 1778 (2007) (quoting United States v. Place, 462 U.S. 696, 703, 103 S. Ct. 2637 (1983)). This "requires careful attention to the facts and

circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S. Ct. at 1872. "[T]he reasonableness of a 'particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " Mercado, 407 F.3d at 1157 (quoting Graham, 490 U.S. at 396, 109 S. Ct. at 1872). The court must also allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97, 109 S. Ct. at 1872. Moreover, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 396, 109 S. Ct. at 1871-72 (citations omitted).

Based on the facts viewed in the light most favorable to Ms. Davis, none of the Individual Defendants' actions in using four point restraints, carrying her, and placing her on her stomach for transport (or failing to intervene in any of these acts) constitute a violation of her Fourth Amendment rights. Ms. Davis repeatedly admits that she was extremely intoxicated on April 9, 2011, that her behavior was out of control, and that she continuously and violently kicked at, spit on, bit, or attempted to bite, the various officers. She testified that she was resistant, combative, belligerent, and refused to cooperate with the officers because she was aggravated and "you can't reason with drunk people." She

further testified that she did not stop resisting even when she was on the ground with her hands and legs in cuffs.  Ms. Davis even acknowledged that the officers would have been justified, in her opinion, in using a more severe degree of force by deploying tasers in order to effect her compliance.

The undisputed facts also clearly show that the decision to place Ms. Davis in four point restraints, both at the time of her arrest and at the booking station, was in direct response to her violent and resistant behavior.  Deputy Sylvester did not apply the four point restraints during Ms. Davis' arrest until she repeatedly kicked, spit and struggled against the officers, including after she was in handcuffs.  And the officers did not apply the four point restraints the second time until after she refused to calm down, attempted to bite Deputy Sylvester on the leg, and actually did bite Officer Alaniz on the hand.  It is thus undisputed that Ms. Davis was posing a clear and immediate threat to the safety of herself and to others both when she was arrested and at the booking station.  Even after Ms. Davis was restrained in leg cuffs and handcuffs, she was still able to harm one officer and came close to harming another.  Moreover, in both instances when Ms. Davis was placed in four point restraints, the officers involved were aware that she had committed crimes of violence.  Indeed, Ms. Davis was charged with (and pleaded no contest to) three felony counts of battery on law enforcement officers and a felony count of resisting arrest with violence.

Under such circumstances it was not unreasonable to use four point restraints on Ms. Davis to prevent her from harming herself or others.  See Lewis, 561 F.3d at 1292

(finding that use of a hobble restraint that was tightened to form a hogtie was not sufficiently egregious to constitute excessive force because suspect refused to sit upright, was unable to remain calm and therefore "remained a safety risk to himself and others."); Garrett v. Athens-Clarke County, Georgia, 378 F.3d 1274, 1280-81 (11th Cir. 2004) (finding police officers were entitled to qualified immunity because it was not unconstitutionally excessive force to pepper spray and fetter a suspect by tying his wrists less than 12 inches from his ankles where suspect continued to violently resist); Cottrell v. Caldwell, 85 F.3d 1480, 1488, 1492 (11th Cir. 1996) (concluding officers did not use excessive force, although arrestee died of positional asphxia, where officers placed arrestee in handcuffs and leg restraints after a 20-minute struggle and put him in a prone position in the back of a police car).  See also Rubio v. Lopez, 445 Fed. Appx. 170 (11th Cir. Aug. 30, 2011) (using hobble restraint on suicidal arrestee who would not stop kicking windows of patrol car, including placing arrestee onto hot pavement during the placement of the restraints, resulting in second degree burns, did not constitute excessive force).

Ms. Davis' makes two additional arguments that the restraints were excessive: (1) that at the time of her arrest, Deputy Sylvester used his K-9 nylon dog leash to restrain her instead of an official nylon hobble device; and (2) that her legs were tied at less than a 90 degree angle.  These arguments are without merit.  First, Ms. Davis relies on the Leesburg Police Department's policies on four point restraints to make these arguments – however, these policies do not apply to Deputy Sylvester, who at all times was governed by the Lake County Sheriff's Office's restraint and use of force guidelines.  Moreover, neither the

Leesburg Police Department, nor the Lake County Sheriff's Offices policies expressly prohibit the use of a nylon dog leash to effect a four point restraint.  Further, the record evidence shows that there is very little difference between the two materials, and Ms. Davis has not made any argument or presented any evidence that the use of the dog leash resulted in an invalid four point restraint, or created any additional force beyond what would have been applied with the hobble device.  Ms. Davis also ignores the fact that exigent circumstances existed in the form of her own resistant and violent behavior which necessitated restraining her quickly and removing her from the rapidly growing crowd.

Ms. Davis' claim that her legs were tied at a less than 90 degree angle fails because there is no evidence that her legs were tied in an unreasonably restrictive manner. Moreover, the Eleventh Circuit Court of Appeals has held that tying a resistant suspect's ankles a mere 12-inches from his ankles (which would necessitate an angle of less than 90 degrees) does not constitute excessive force.  <u>Garrett</u>, 378 F.3d at 1280-81.

Ms. Davis also challenges the manner in which the Defendants carried her out to the golf cart, and later to the squad car.  However, the record evidence shows that she was carried in an appropriate manner.  Each time, three to four officers were used to carry her - one by each shoulder and at least one carrying her legs.  The video in the booking room further demonstrates that contrary to Ms. Davis' testimony, she was not "carried like a suitcase" but rather was escorted out in the most reasonable and least forceful manner. There are also no allegations or evidence that she was jostled or bumped into any walls, or that any officers groped or harmed her while she was being carried.

36

Lastly, relying on Leesburg Police Department policy,[19] Ms. Davis complains that the Individual Defendants used unconstitutionally excessive force when they placed her on her stomach in the back seat of the golf cart and the back seat of the patrol car for transport. This argument is also without merit.  As discussed in detail, Ms. Davis was continuing to resist, struggle, and fight with the officers throughout her arrest and detention at the booking room.  Safety concerns required the removal of Ms. Davis from the Bike Fest as expeditiously as possible and patrol cars were not readily available.  Moreover, the record evidence shows that the back seat of the golf cart was not large enough to place Ms. Davis entirely on her side – the two officers who monitored her had to stand on the sides of the golf cart – and, more importantly, Ms. Davis' head was tilted so that she could breath freely. Lastly, Ms. Davis has not submitted any evidence suggesting that her head also was not tilted while in the back of the patrol car, or that she had any problems breathing at any point in time.  In sum, the Court is not persuaded by any of Ms. Davis' arguments.

This Court must be mindful of Graham's explicit recognition of, and allowance for, a measure of deference to police judgment given the "tense, uncertain and rapidly evolving" circumstances that police often confront.  490 U.S. at 396-97, 109 S. Ct. at 1871-72.  In light of the totality of the circumstances, the actions of Deputy Sylvester, Officer Alaniz, and Deputy Lukens did not constitute excessive force and did not violate Ms. Davis'

---

[19]Ms. Davis has presented evidence that the Leesburg Police Department's policy requires persons placed in four point restraints to be rolled on their side to prevent positional asphyxia, and that such persons must be monitored at all times.  (Doc. 54-6, pp. 9-10)

Fourth Amendment rights.  Because the Court finds that there was no application of excessive force, the Court also finds that there was no violation of Ms. Davis' civil rights that required any intervention on the part of the other Defendants.  Therefore, Ms. Davis' claims that Officers Lane and Abston, Sergeant Romanelli, and Deputy Brown failed to take action cannot go forward.  Summary judgment will be granted on Counts I and VII due to the absence of a constitutional violation.[20]

## C.   Excessive Force Claims Involving Broken Teeth

Ms. Davis' third excessive force claim is asserted in Count IV of her Second Amended Complaint.  She alleges that while she was still in handcuffs and leg restraints sitting on the floor of the booking room, that Officer Alaniz and Deputy Sylvester engaged in unconstitutionally excessive force when they smashed her face into the floor of the booking room, breaking three of her teeth, and kept her head down on the floor for almost two minutes.

The law of the Circuit holds that using unjustified force on a restrained, non-aggressive, compliant, and non-resistant person is considered unconstitutionally excessive force.  See Lee, 284 F.3d at 1198; Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir.

---

[20]Even if Ms. Davis were able to establish a violation of her constitutional rights, these Defendants would still be entitled to qualified immunity as the law was not clearly established on April 9, 2011 that placing Ms. Davis in four point restraints and transporting her in the manner utilized that night constituted a violation of her Fourth Amendment rights.  Ms. Davis has not submitted any binding precedential authority in existence at the time of Ms. Davis' arrest even suggesting that the manner in which Ms. Davis was restrained, carried, or transported was unconstitutional.  To the contrary, the clearly established law at the time permitted the use of four point restraints under the circumstances in existence that night.  See Garrett, 378 F.3d 1274; Lewis, 561 F.3d 1288, Cottrell, 85 F.3d 1480.

2000); <u>Priester v. City of Riviera Beach, Florida</u>, 208 F.3d 919, 927 (11th Cir. 2000). <u>See also</u> <u>Saunders v. Duke</u>, ___ F.3d ___, 2014 WL 4403045 (11th Cir. Sep. 8, 2014) (defendant who alleged that his head was slammed against the pavement with extreme force after he had been handcuffed, was not resisting, and was lying prone on the ground stated a claim for excessive force); <u>Runge v. Snow</u>, 514 Fed. Appx. 891 (11th Cir. Mar. 27, 2013) (holding the gratuitous use of force when a criminal suspect is detained and not resisting arrest constitutes excessive force); <u>Hilger v. Velazquez</u>, 463 Fed. Appx. 847 (11th Cir. Mar. 26, 2012) (finding officers were not entitled to qualified immunity when they slammed a handcuffed and non-resisting woman against a wall and then continued to kick her after she fell to the floor). However, this is not such a case.

Although Ms. Davis' testimony is somewhat inconsistent concerning the facts of this claim,[21] she admits that her face was forced to the ground only <u>after</u> she attempted to bite Deputy Sylvester on the leg. She also admits that she was wriggling around, screaming, cursing, and non-compliant while in the booking room, and did not stop wriggling around until she had been held to the ground by Deputy Sylvester for close to two minutes. And, she admits that she bit Officer Alaniz on the hand. Clearly, even though Ms. Davis was

---

[21]Ms. Davis first complained that she broke her teeth when an unknown officer smashed her face into the sidewalk during her initial arrest. Then she claimed that an unknown officer smashed her teeth while she was sitting on the floor of the booking room. Lastly, she testified that an unknown officer grabbed her by her hair and smashed her face into the ground <u>after</u> the four point restraints were reapplied.

restrained, she was continuing to resist and was continuing to attempt to cause injury to officers.

It is also clear that any reasonable fact finder would conclude that Deputy Sylvester did not use any more force than necessary to subdue Ms. Davis. He forced her head to the floor in direct response to her attempt to bite him. He did not hit her, kick her, or deploy any weapons such as a taser or pepper spray. And once Ms. Davis calmed down, he immediately released her and walked out of the booking room. In such circumstances, the Court cannot say that Deputy Sylvester's restraint of Ms. Davis by forcing her head down to the ground was unreasonable and unconstitutionally excessive. And although Ms. Davis suffered serious injuries in the form of three broken teeth and bruising, these injuries were not the result of disproportionate or excessive force, but were rather the result of objectively reasonable actions taken by Deputy Sylvester to secure a continually resisting and violent suspect. See Buckley v. Haddock, 292 Fed. Appx. 791 (11th Cir. Sept. 9, 2008) (finding qualified immunity applied where officer deployed taser on suspect who was handcuffed but continued to resist and refused to comply with instructions).

Summary judgment is also warranted in favor of Officer Alaniz as the evidence clearly shows he was not involved in any use of force against Ms. Davis in the booking room. Contrary to Ms. Davis' allegations, the booking room video recording shows that Officer Alaniz did not force Ms. Davis' head to the ground, nor does it show any officer grabbing Ms. Davis by the hair. Instead, the video recording depicts Officer Alaniz walking over to Deputy Sylvester after Ms. Davis' head was already on the ground, and kneeling

next to her.  After 12 seconds (during which time it appears that Ms. Davis bit him) Officer

Alaniz gets up, walks away, and has no further contact with Ms. Davis.  These undisputed

facts demonstrate that Officer Alaniz did not engage in <u>any</u> force, much less excessive

force, with respect to Ms. Davis.

And even if these Defendants' actions were excessive under the Fourth Amendment,

both Officer Alaniz and Deputy Sylvester would be entitled to qualified immunity because

the law was not clearly established as of April 9, 2011 that his actions violated Ms. Davis'

constitutional rights.  "For qualified immunity to be surrendered, pre-existing law must

dictate, that is, truly compel (not just suggest or allow or raise a question about) the

conclusion for every like-situated, reasonable government agent that what defendant is

doing violates federal law in the circumstances."  <u>Jenkins by Hall v. Talladega City Bd. of</u>

<u>Educ.</u>, 115 F.3d 821, 823 (11th Cir. 1997) (quoting <u>Lassiter v. Alabama A & M Univ.</u>, 28

F.3d 1146, 1150 (11th Cir. 1994) (en banc)).  To prove that the law was "clearly

established," a plaintiff may point to either

> (1) earlier case law from the Supreme Court, [the Eleventh Circuit], or the
> highest court of the pertinent state that is materially similar to the current case
> and therefore provided clear notice of the violation or (2) general rules of law
> from a federal constitutional or statutory provision or earlier case law that
> applied with 'obvious clarity' to the circumstances, establishing clearly the
> unlawfulness of the Defendants' conduct.

<u>Long v. Slaton</u>, 508 F.3d 576, 584 (11th Cir. 2007) (citing <u>Marsh v. Butler Cnty.</u>, 268 F.3d

1014, 1031-33 (11th Cir. 2001) (en banc)).  A plaintiff may also show that an "official's

conduct 'was so far beyond the hazy border between excessive and acceptable force that

[the official] had to know he was violating the Constitution even without caselaw on point.'"

Priester, 208 F.3d 919, 926 (11th Cir. 2000) (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)).

The Court has canvassed the decisional authority of the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the Supreme Court of Florida and has been unable to find a single case holding that a law enforcement officer used excessive force against a suspect who was in restraints but continued to resist and engage in violent behavior.  To the contrary, every decision the Court has reviewed has reaffirmed the legal principle that an officer may not continue to use force after a suspect stops resisting.  Thus, there is a complete absence of binding precedent as of April 9, 2011 establishing that the use of force against a person in handcuffs under materially similar facts constitutes a Fourth Amendment violation.  Instead, the general rules of law in existence at that time strongly suggest that Deputy Sylvester's actions towards Ms. Davis – who, it cannot be overstated, was struggling and attempting to cause physical injury to other officers – were reasonable.  For these reasons, the Court finds that Deputy Sylvester's conduct was not so far beyond the border of acceptable force that he had to know he was violating the constitution.

Summary judgment will be granted as to Count IV.

### D.     Intrusion of Bodily Privacy Claims

Count X of Ms. Davis' Second Amended Complaint is a claim against Deputy Lukens, Officer Alaniz, Officer Lane, Sergeant Romanelli, Officer Abston, Deputy Brown, and Deputy Sylvester for intrusion of bodily privacy.  Ms. Davis alleges that "Defendants were aware that while hog-tied by a dog leash she could not cover herself and forced her to remain in this degrading state for an extended period of time in violation of her right to privacy of her unclothed body."  (Doc. 25, ¶ 108).  Ms. Davis further alleges that these Defendants "gawked" at her breasts and made crude remarks and jokes.

Prisoners and pretrial detainees have a constitutional right to bodily privacy.  Fortner v. Thomas, 983 F.2d 1024, 1026 (11th Cir. 1993) (finding right as to prisoners); Powell v. Barrett, 541 F.3d 1298, 1314 n. 7 (11th Cir. 2008) ("jail inmates retain a right to bodily privacy that implicates the Fourth Amendment").  See also Bell v. Wolfish, 441 U.S. 520, 535, 99 S. Ct. 1861, 1872 (1979) (pretrial detainees have due process rights under Fourteenth Amendment); Cook v. Sheriff of Monroe County, 402 F.3d 1092, 1115 (11th Cir. 2005) (the legal standards under the Eighth Amendment for prison inmates are the same as those under the Fourteenth Amendment for pretrial detainees).  This right to bodily privacy encompasses a pretrial detainee's protection from the involuntary exposure of a detainee's genitals in the presence of people of the other sex, which "may be especially demeaning and humiliating."  Webb v. White, 2008 WL 4889116 at * 2 (M.D. Fla. Nov. 12,

2008) (quoting <u>Fortner</u>, 983 F.2d at 1030).  Under the facts of this case, the Court finds that Ms. Davis' right to bodily privacy was not violated.

The cases in this Circuit that have found a violation of a right to bodily privacy have uniformly held that the violation occurred when the officers caused the pretrial detainee or inmate to be exposed and engaged in some additionally offensive conduct.  For example, in <u>Fortner</u>, the male prisoners claimed that female officers solicited them to "masturbate and otherwise exhibit their genitals for the female officers' viewing." 983 F.2d at 1027.  And in <u>Boxer X v. Harris</u>, 437 F.3d 1107, 1111 (11th Cir. 2006), the Eleventh Circuit found that a male prisoner stated a claim for violation of his privacy rights where he alleged that a female officer solicited him to masturbate for her viewing. These cases involved factual scenarios much more egregious than that presented by the evidence in this case.

Ms. Davis contends that she was kept in a state of undress for a prolonged period of time, and that officers gawked at her and made crude comments about her.   However, the undisputed material facts show that Ms. Davis became topless during the course of her struggles with the law enforcement officers.  The undisputed facts further show that the officers removed Ms. Davis from the scene of her arrest, without immediately covering her breasts, due to her continued violent resistance, and the risk of escalating violence from a rapidly growing crowd.  Even more damning, is the fact that Ms. Davis has admitted that she refused to allow anyone, including her best friend, to attempt to cover her up once she was in the booking room – testimony that is corroborated by the video recording from the booking room.   The video recording further shows that Ms. Davis' continued violent

behavior necessitated the immediate removal of her person from the booking room to the Jail.  In fact, Ms. Davis has admitted that she wouldn't let anyone cover her up at the Jail until more than an hour had passed.

This is simply not a case where any officers violated Ms. Davis' privacy rights or left her unclothed for no legitimate law enforcement purpose – to the contrary, the facts show that Ms. Davis herself chose to remain unclothed for a large portion of the events in question, while officers were attempting to clothe her, not the other way around.  Cf. Mitchell v. Stewart, 2014 WL 2617275 (M.D. Ga. June 12, 2014) (finding no defense of qualified immunity where sheriff's deputies escorted arrestees out of their house nearly naked and transported them to jail with their breasts, buttocks, and genitalia exposed, where deputies offered no legitimate law enforcement purpose for escorting arrestees out of their home without enough clothes to cover their private areas).

Ms. Davis also has not established a constitutional violation based on her allegations that the Defendants gawked at her and/or made crude comments.  First, her own testimony shows that she has no recollection of any officers staring or gawking at her breasts, and she could not remember any comments made by any officers.  (Davis Dep., pp. 140-41). Second, every court to consider the issue, including this Circuit, has held that using abusive or foul language, including threatening language and gestures by a custodial officer, does not amount to a constitutional violation.  See Evans v. City of Zebulon, Ga., 351 F.3d 485, 495-96 (11th Cir. 2003), *vacated on other grounds, rehearing en banc*, 407 F.3d 1272 (11th Cir. 2005); Doe v. Gooden, 214 F.3d 952, 955 (8th Cir. 2000); McFadden

v. Lucas, 713 F.3d 143, 146 (5th Cir. 1983); Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979); Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir. 1973); T.W. ex rel. Wilson v. School Bd. of Seminole County, Fla., 2009 WL 1140101 at * 5 (M.D. Fla. Apr. 28, 2009).[22]

Summary judgment will be granted as to Count X.

### E.   Denial of Medical Care Claims

Count XIII of the Second Amended Complaint asserts a claim for denial of access to medical care against Defendants Deputy Lukens, Officer Alaniz, Officer Lane, Sergeant Romanelli, Officer Abston, Deputy Brown, and Deputy Sylvester based on their failure to provide Ms. Davis with emergency medical care for her broken teeth.  In her response in opposition to summary judgment, Ms. Davis "concedes that after discovery denial of medical care counts are not appropriate against other officers and drops all of them except for Sylvester."  (Doc. 67, p. 16).[23]  Summary judgment will therefore be granted as to Lukens, Alaniz, Lane, Romanelli, Abston, and Brown.

Ms. Davis' basic claim is that she was denied proper medical care for her broken teeth, and that her need for care was apparent.  (Davis Dep., pp. 221-222; Doc. 67, p. 16) Because she had not been convicted at the time she allegedly required medical care, the

---

[22]For these same reasons, the Court concludes that the Defendants are also entitled to qualified immunity because the law was not clearly established as of April 9, 2011 that Ms. Davis' state of undress under the circumstances in existence that night, violated her right to bodily privacy. Simply put, there was no binding precedential authority sufficient to place the Defendants on notice that their actions, or failures to act, violated the constitution.

[23]Ms. Davis also agreed to drop her denial of medical care claim against the City of Leesburg (Count XIV).  Summary judgment will therefore be granted on this claim.

Eighth Amendment has no application to this claim; rather, the relevant constitutional provision is the due process clause of the Fourteenth Amendment.  City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S. Ct. 2979, 2983 (1983).  That clause "require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by police."  Id. at 245-46, 103 S. Ct. at 2983.

The Eleventh Circuit applies the "deliberate indifference" standard to claims of improper medical care by plaintiffs like Ms. Davis.  See Aldridge v. Montgomery, 753 F.2d 970, 972 (11th Cir. 1985).  To prove "deliberate indifference" to a serious medical need, a plaintiff must show " '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'" Youmans v. Gagnon, 626 F.3d 557, 564 (11th Cir. 2010) (quoting Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010) (quoting Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005)).  "The best response to a serious medical need is not required by federal law in these cases."  Id. Rather, it is a fact specific inquiry, dependent in large part on the nature of the suspect's injury.  A plaintiff must also show that she was suffering from a "serious medical need," which is defined as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (citations omitted).  See also Farmer v. Brennan, 511 U.S. 825, 934, 114 S. Ct. 1970, 1977 (1994)

(holding that a serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm.").

The Eleventh Circuit has recognized that "[i]n certain circumstances, the need for dental care combined with the effects of not receiving it may give rise to a sufficiently serious medical need to show objectively a substantial risk of serious harm." Farrow, 320 F.3d at 1243-44.  In Farrow, the Court of Appeals found that the plaintiff, a state prisoner, established a serious dental need based on evidence demonstrating "pain, continual bleeding and swollen gums, two remaining teeth slicing into gums, weight loss, and continuing medical problems." Id., at 1244-45.  See also Noel v. Hewett, 2013 WL 3289028 (S.D. Ga. June 28, 2013) (finding a state inmate demonstrated a serious medical need through evidence revealing "severe and longstanding dental problems at the time he was seen by the defendants, including advanced periodontitis, tooth deterioration and decay, cracked and broken teeth, a failed root canal, dental infections, missing fillings, and other problems likely to result in episodes of significant pain.").

Ms. Davis' complaints about her three broken teeth do not reach the same level of seriousness of the dental issues in Farrow and Noel.  However, the Court will presume for the moment that Ms. Davis can establish that she suffered from a serious medical condition.  And taking the facts in the light most favorable to Ms. Davis, it is further established that Deputy Sylvester forced her head to the ground, after which she repeatedly complained about her "busted teeth."  The facts further demonstrate that Deputy Sylvester heard Ms. Davis' complaints, and observed that she had at least one broken

tooth.  Lastly, the facts show that Deputy Sylvester did not report Ms. Davis' complaints to anyone, and did not attempt to provide her with any medical or dental care.  Rather, after he removed his hand from the back of her neck, he simply left the booking room.  Thus, it is at least arguable that Ms. Davis is able to establish deliberate indifference on the part of Deputy Sylvester.

What makes this a close case, however, is the fact that within five minutes of Deputy Sylvester leaving the booking room, the other officers transported Ms. Davis to the Jail, where she remained for several hours and received some medical care.  Thus, in order for this claim to survive, Ms. Davis would have to pursue a legal theory that at the time she was arrested, as soon as she complained about her "busted teeth," Deputy Sylvester should have immediately ceased all booking procedures and directed that Ms. Davis receive emergency dental care, rather than have her transported to the Jail a few minutes later where medical treatment was also available.  Indeed, Ms. Davis concedes that she "must rely on the jail authorities to treat her medical needs." (Doc. 67, pp. 16-17).[24]  Under these facts, the Court is hard pressed to find that Deputy Sylvester engaged in conduct that was more than gross negligence.  Cf. Youmans v. Gagnon, 626 F.3d 557 (11th Cir. 2010) (four hour delay in obtaining medical treatment for detainee with visible cuts and bruises does not constitute deliberate indifference); Kane v. Hargis, 987 F.2d 1005, 1008-09 (4th

_____

[24]Notably, Ms. Davis has not brought claims against any Jail personnel for denying her medical care.  Her claim against the Sheriff for denial of medical care is based upon a municipal liability theory of custom, policy, or practice.

Cir. 1993) (concluding that four hour delay in seeking medical treatment for "cracked teeth, a cut nose, and a bruised face" was not a constitutional violation where there was " no indication these injuries required immediate medical attention.").

More importantly, even if Deputy Sylvester's conduct equated to a violation of Ms. Davis' Fourteenth Amendment rights, this claim would still fail as Ms. Davis has not shown that her right to immediate medical treatment was clearly established at the time her teeth were broken.  Ms. Davis  has not cited, and the Court has been unable to locate, a single Supreme Court, Eleventh Circuit Court of Appeals, or Supreme Court of Florida decision in existence as of April 9, 2011 holding that three broken teeth constituted a serious medical condition for which a short delay in treatment would be unconstitutional.  Rather, the only cases the Court has been able to locate involved far more detailed and obviusly serious dental injuries, with related medical issues, and delays in treatment ranging from weeks to months.  Farrow, 320 F.3d at 1243-45.   The Court cannot say that Farrow truly compelled "the conclusion for all reasonable, similarly situated public officials that what [Deputy Sylvester was] doing violated [Ms. Davis'] federal rights in the circumstances." Gilmore v. Hodges, 738 F.3d 266, 278 (11th Cir. 2013) (citations omitted).[25]  "[O]fficials are

---

[25]In Gilmore, a pretrial detainee filed a § 1983 claim against prison officials, alleging that the denial of batteries for his hearing aids constituted deliberate indifference to his serious medical needs.   The Eleventh Circuit discussed prior appellate decisions which recognized that the unavailability of eyeglasses, prosthetic devices, and dentures equated to the unconstitutional deprivation of adequate medical care, and held that these decisions did not sufficiently place reasonable officers on notice that the denial of hearing aid batteries to inmates with hearing loss would also equate to an Eighth Amendment violation.  As such, the Eleventh Circuit held that the law was not clearly established at the time the officers failed to provide the hearing aid batteries, (continued...)

not obligated to be creative or imaginative in drawing analogies from previously decided cases." Coffin v. Brandau, 642 F.3d 999, 1015 (11th Cir. 2011) (quoting Adams v. St. Lucie Cnty. Sheriff's Dep't., 962 F.2d 1563, 1575 (11th Cir. 1992)).  For the purposes of qualified immunity, it would not have been obvious to a reasonable officer that prior binding case law inevitably compelled a finding that Deputy Sylvester's actions were unconstitutional.

Summary judgment will be granted as to Count XIII.

### III.    The Muncipal Liability Claims

Ms. Davis has also asserted 10 claims against the City of Leesburg and the Sheriff of Lake County  based on the use of the four point restraints (Counts II-III, VIII-IX), Deputy Sylvester's smashing of her face on the booking room floor (Counts V-VI), the exposure of her bare breasts (Counts XI-XII) and the denial of access to medical care for her broken teeth (Counts XIV-XV).  Ms. Davis contends that this purported use of excessive force, invasion of her bodily privacy rights, and deliberate indifference to her serious medical needs were all caused by a policy, custom, or practice of the City and/or the Sheriff. Summary judgment is warranted as to each of these claims for several reasons.[26]

---

[25](...continued)
and qualified immunity shielded the officers from liability.  See 738 F.3d at 278-280.

[26]Ms. Davis concedes that summary judgment is appropriate on her denial of access to medical care claim against the City (Count XIV).  See Doc. 67, p. 16.

"For liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents." Owens v. Fulton County, 877 F.2d 947, 951 n. 5 (11th Cir. 1989). The doctrine of respondeat superior does not apply in actions under § 1983, and a municipality or a government agency "may only be held liable under 42 U.S.C. § 1983 when the injury caused was a result of municipal policy or custom." Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1293 (11th Cir. 2009). A municipal policy or custom is "a persistent and wide-spread practice." Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir. 1994). A plaintiff must establish, not only that the policy or custom existed, but also that "actual or constructive knowledge of such custom" is attributable to municipal officials. Id. Therefore, "random acts or isolated incidents" are generally not enough to establish municipal or governmental liability. Id.

As an initial matter, each of Ms. Davis' municipal liability claims are deficient because, as discussed at length, *supra*, the undisputed facts demonstrate that she has not suffered any violations of her constitutional rights. In order to establish municipal liability under § 1983, a plaintiff must first establish that one or more of her constitutional rights were violated. Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir. 1996); Vineyard v. County of Murray, Ga., 990 F.2d 1207, 1211 (11th Cir. 1993).

And even if Ms. Davis were able to establish a violation of her constitutional rights, her municipal liability claims would fail because she has not identified any policy, practice, or custom that caused her injuries. Board of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 403, 117 S. Ct. 1382, 1388 (1997) ("[A] plaintiff seeking to impose

liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury.").   A plaintiff may establish liability pursuant to a municipal policy when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."   Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S. Ct. 1292, 1300 (1986).   "To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law."   Griffin v. City of Opa–Locka, 261 F.3d 1295, 1308 (11th Cir. 2001) (quotation omitted).

Ms. Davis has not pointed to any City or Sheriff policies relating to the use of four point restraints, the use of force in general, or the provision of medical care that caused any of Ms. Davis' alleged injuries.   And, she has not provided any evidence establishing a widespread practice by either the City or the Sheriff's Office of improperly using four point restraints, excessive force, permitting female inmates to remain in unclothed states, or denying or delaying medical care.   To the contrary, the City has submitted the deposition testimony of Chief of Police William Chrisman, and the Sheriff's Office has submitted the affidavit of Lieutenant John Herrell (Docs. 54-9, 55-5).   This testimony demonstrates that both the City and the Sheriff's Office had in place as of April 9, 2011, policies governing the use of force during an arrest, including the use of restraints, and the provision of medical

care to arrestees.  This evidence further shows that there was no widespread history of excessive force violations involving the use of restraints, or denial of medical care.

In response Ms. Davis argues that the City and the Sheriff's Office should be liable under two theories.  First, that the City and the Sheriff's Office failed to adequately train or supervise their officers.  And second, that the City and the Sheriff's Office ratified the purported constitutional violations of their officers by failing to properly investigate Ms. Davis' April 11, 2011 complaint, failing to discipline the officers, and by later giving them "glowing performance reviews" and "continued affirmation of their actions." (Doc. 67, pp. 13-16, 18).

### A.    Failure to Train

A "[m]unicipal policy or custom may include a failure to provide adequate training if the deficiency 'evidences a deliberate indifference to the rights of its inhabitants.'" Lewis, 561 F.3d at 1293 (quoting City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1205-06 (1989)).  "To establish a [municipality's] deliberate indifference, 'a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.'" Id. (quoting Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)).  "A [municipality] may be put on notice in two ways" – if it is aware of "a pattern of constitutional violations" but "nevertheless fails to provide adequate training" or "if the likelihood for constitutional violation is so high that the need for training would be obvious." Id.  "In resolving the issue

of [a municipality's] liability, 'the focus must be on the adequacy of the training programs in relation to the tasks the particular officers must perform,' and not merely on the training deficiencies for a particular officer." Id. (quoting City of Canton, 489 U.S. at 390, 109 S. Ct. at 1205-06).  "It is thus irrelevant what training each specific officer present at the scene was given or retained."  Id.

Ms. Davis does not provide any evidence or legal authority to support this claim. Rather, she simply and repeatedly broadly states that the City and the Sheriff's Office "failed to adequately train, supervise, or discipline deputies for acting against their own policies and procedures."  (Doc. 67, pp. 13-16, 18).  She has not come forward with any evidence of prior incidents of excessive force, improper use of restraints, failure to clothe a partially naked arrestee, or denial of medical care such that either the City or the Sheriff would be on notice that their officers and deputies were insufficiently trained in these areas. The absence of such evidence alone is fatal to Ms. Davis' argument.  Before municipal liability can arise based on the failure to establish a training policy or procedure, "the need for such training must be plainly obvious to Department decisionmakers."  Wright v. Sheppard, 919 F.2d 665, 674 (11th Cir. 1990).  The need for training is not plainly obvious unless there is "evidence of a history of widespread abuse."  Id.  See also Rocker v. City of Ocala, Fla., 355 Fed. Appx. 312, 314 (11th Cir. Dec. 3, 2009).

Instead, Ms. Davis makes much of the fact that the Individual Defendants did not comply with Leesburg Police Department policies when they used a K-9 nylon dog leash to effect the four point restraints, tied Ms. Davis' legs at less than a 90 degree angle, and

transported her on her stomach instead of on her side.  However, this argument is weakened by the undisputed fact that these policies do not apply to any of the deputy sheriffs, and because the policies do not explicitly prohibit the behavior Ms. Davis references.  Moreover, the training deficiencies of any particular officer (assuming such deficiencies existed) do not create municipal liability.  Lewis, 561 F.3d at 1293.

Ms. Davis also focuses on the events that transpired on April 9, 2011.  She argues that the Individual Defendants' actions were so clearly excessive, coupled with the fact that no other officers intervened, that a custom, policy or practice of inadequate training must have existed.  This argument is without merit as a single event cannot establish a municipal policy or custom, or a lack of adequate training.  Craig v. Floyd Cnty., 643 F.3d 1306, 1310 (11th Cir. 2011) (" 'Proof of a single incident of unconstitutional activity is not sufficient to impose liability' against a municipality.") (quoting City of Okla. City v. Tuttle, 471 U.S. 808, 105 S. Ct. 2427 (1985)).  "A pattern of similar constitutional violations is ordinarily necessary.  A single incident would not be so pervasive as to be a custom because a custom must be such a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it."  Id. (internal citations omitted).

### B.     Ratification

Ms. Davis next argues that the City and the Sheriff should be held liable under a ratification theory.  Specifically, she contends that the City's investigation into her April 9,

2011 complaint was cursory, and the Sheriff did not conduct any investigation.  She also references the fact that none of the Individual Defendants received any discipline for her arrest, and that many of the officers and deputies later received above average annual performance evaluations.

In order to establish liability under § 1983 under a ratification theory, Ms. Davis must show a "persistent failure to take disciplinary action against officers" who use excessive force, deny medical care, or violate bodily privacy, which "can give rise to the inference that a municipality has ratified conduct, thereby establishing a 'custom' within the meaning of Monell [v. Department of Social Services, 436 U.S. 658, 90 S. Ct. 2018 (1978)]." Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir. 1985).  See also Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir. 1994) ("A municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference toward the police misconduct.").

The problem with Ms. Davis' argument, as noted above, is that she cannot point to a widespread practice of excessive  force, denial of medical care, or violations of bodily privacy to begin with.  Without that, her contention that the City or the Sheriff deliberately ignored an unconstitutional custom or policy has been cut off at the knees.  Moreover, "[a]n inadequate investigation following the subject incident will not sustain a claim of municipal liability, because after-the-fact inadequate investigation could not have been the legal cause" of Ms. Davis' injuries. Feliciano v. City of Miami Beach, 847 F. Supp. 1359, 1367

(S.D. Fla. 2012).   And even if after-the-fact actions could form the basis for a ratification claim in this case, Ms. Davis has not presented any evidence showing that the final policymakers – the Chief of Police and the Sheriff – knew of Ms. Davis' arrest, had an opportunity to review her arrest, and approved her arrest and detention.  See City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S. Ct. 915, 926 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.").

Summary judgment will be granted in favor of the City and the Sheriff as to all of Ms. Davis' § 1983 municipal liability claims.

## IV.   State Law Claims

The five remaining claims in Ms. Davis' Second Amended Complaint assert state law torts for battery (Counts XVI-XVIII), intentional infliction of emotional distress (Count XIX), and negligent spoilation of evidence (Count XX).[27]  Two of the battery claims (Counts XVI and XVII) are alleged against Deputy Lukens, Deputy Sylvester, Officer Alaniz, and Sergeant Romanelli, and relate to the use of the four point restraints and Ms. Davis' transport to the booking room and Jail.  Summary judgment shall be granted as to these

---

[27]The only basis for the Court's jurisdiction over these claims is pendent and ancillary supplemental jurisdiction under 28 U.S.C. § 1367.  The Court has discretion to decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  However, in this case the Court will exercise its discretion to retain jurisdiction.  The case has already progressed through nearly two years of litigation, including lengthy discovery, and is set for trial within the next month.  Moreover, as discussed infra, none of the state law claims are factually or legally viable, and it would not serve the interests of justice or judicial economy to remand meritless claims.

claims because under Florida law, these law enforcement officers are entitled to use reasonable force to carry out a lawful arrest without opening themselves to individual tort liability. City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. Dist. Ct. App. 1996) ("an officer is liable for damages only where the force used is clearly excessive."). See also Fla. Stat. § 776.05(1) ("The officer is justified in the use of any force . . . . Which he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm while making the arrest."). The Court has previously determined that the force used to place Ms. Davis in four point restraints was reasonable and not clearly excessive.

Summary judgment shall also be granted as to the third battery claim (Count XVII) against Officer Alaniz and Deputy Sylvester. This claim relates to Ms. Davis' broken teeth. As discussed above, Officer Alaniz did not participate in this claim, and therefore did not batter Ms. Davis. And as also discussed above, Deputy Sylvester's actions did not constitute excessive force, therefore also precluding any state law battery claim.

The intentional infliction of emotional distress claim (Count XIX) is asserted against Deputy Lukens, Officer Abston, Sergeant Romanelli, Deputy Sylvester, and Officer Alaniz, and relates to the entirety of Ms. Davis' arrest and detention (the four point restraints, leaving her bare chested, and smashing her face into the ground). Under Florida law, the tort of intentional infliction of emotional distress requires Ms. Davis to prove the following elements: (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct, i.e., behavior that goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community; (3) the conduct caused the

Case 5:12-cv-00609-WTH-PRL   Document 89   Filed 09/30/14   Page 60 of 62 PageID 2732

emotional distress; and (4) the distress was severe.  <u>Rubio v. Lopez</u>, 445 Fed. Appx. 170, 175 (11th Cir. Aug. 30, 2011); <u>Liberty Mut. Ins. Co. v. Steadman</u>, 968 So. 2d 592, 594-95 (Fla. Dist. Ct. App. 2007).

These Defendants are entitled to summary judgment on this claim.  For the many reasons discussed in this Order, Ms. Davis has failed to produce evidence that any of the Defendants' conduct went "beyond all possible bounds of decency," and was "atrocious, and utterly intolerable in a civilized community."  <u>Liberty Mut. Ins.</u>, 968 So. 2d at 594-95. In addition, Ms. Davis has failed to show that these Defendants' conduct caused her severe emotional distress.  She testified that she saw a licensed mental health counselor once on April 8, 2013, two years after her arrest, and that the majority of her emotional distress relates to the fact that she is now a convicted felon and may not be able to obtain employment as a nurse (Davis Dep., pp. 153, 157).  Moreover, the report from her mental health counselor did not identify any severe emotional distress; rather her "mood appeared stable," and "she seems most disturbed by the possibility of her future career goals being impeded by [her criminal charges]." (Davis Dep., Ex. 4, pp. 22-23).  <u>See</u> <u>Rubio</u>, 445 Fed. Appx. at 175 (affirming summary judgment on intentional infliction of emotional distress claim where plaintiff did not produce evidence of severe emotional distress or outrageous conduct).

Summary judgment will be granted in favor of the Defendants as to Counts XVI-XIX.[28]

This brings the Court to the final claim – negligent spoliation of evidence (Count XX). This claim is asserted against the City of Leesburg and relates to the Leesburg Police Department's purported failure to preserve the entirety of the video recording from the booking room.  Summary judgment shall be granted on this claim because in 2005, the Florida Supreme Court held that the remedy against a first-party defendant for spoliation of evidence (*i.e.,* where the party charged with failing to preserve evidence is the defendant in the litigation) is not an independent cause of action for spoliation of evidence.  Instead, the available remedies are discovery sanctions and a rebuttable presumption of negligence for the underlying tort.  <u>Martino v. Wal-Mart Stores, Inc.</u>, 908 So. 2d 342, 346-47 (Fla. 2005).  And in this case there are no underlying torts remaining to litigate.

## <u>Conclusion</u>

Accordingly, upon due consideration, it is hereby ORDERED as follows:

(1)   The Defendants' Motions to Dismiss Plaintiff's Second Amended Complaint (Docs. 26-27) are DENIED;

(2)   The Defendants' Motions for Summary Judgment (Docs. 53, 55, 56, 57, 58) are GRANTED.  The Clerk is directed to enter judgment in favor of Defendants City of

---

[28]Summary judgment is warranted on these claims for one additional reason.  Each of these Defendants is entitled to statutory immunity as the undisputed facts show as a matter of law that none of these Defendants acted "in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  Fla. Stat. § 768.28(9).

Leesburg, Sheriff of Lake County Gary S. Borders, Christopher Alaniz, Kenneth Lane, Nick Romanelli, Ryan Abston, Thomas Brown, Shawn Lukens, and Richard Sylvester, as to all claims asserted against them in the Second Amended Complaint.

(3)     Pursuant to the Plaintiff's Notice of Dropping Party Defendants, which the Court interprets as a notice of dismissal, (Doc. 39), the Clerk is further directed to enter judgment dismissing WITHOUT PREJUDICE all claims against Defendants Michael Godigkeit and J.G. Sommersdorf, each Party to bear its own fees and costs.  See Fed. R. Civ. P. 41(a)(1).

(4)     The Clerk is further directed to terminate all other pending motions and to close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 30th day of September, 2014.

UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record
              Maurya A. McSheehy